HOLMES vs. FRESH.

1. It is not sufficient to make a sale purporting to be absolute, a mortgage, that the party executing it, considered it as such: it must be so considered and intended by all the parties thereto.

2. Inadequacy of price alone, is no ground on which equity will relieve against, or set aside a contract.

3. Inadequacy of price, coupled with circumstances which show oppression or command over the maker, will be regarded as a fraud upon him, and entitle him to relief in equity.

.Under the general prayer for relief, the court will grant such relief as is warranted by the allegations and proof.

APPEAL from Marion Circuit Court. In Chancery.

LEONARD & BAY, for Appellant.

POINTS AND AUTHORITIES.

1. The answer denies that the transaction was a loan of money, and security for its repayment, and the proof is not sufficient to establish the fact against the denial of the answer and the deed of the defendant. Thompson vs. Patton, 5 Littells' Rep. 74 ; Clason vs. Morris, 10 John. Rep. 541 ; Flint vs. Sheldon, 13 Mass. Rep. 445 ; Stackpole vs. Arnold, 11 Mass. Rep. 27; Aborn vs. Burnett, 3 Blackford's Rep. 102; 1 Phillips' Ev. 567-571.

2. The bill does not seek to set aside the bill of sale upon the ground of fraud and oppression in procuring it, and therefore under the pleadings, the complainant cannot have relief upon that ground. Story's Equity Pleadings, secs. 257, 264.

3. If the pleadings were otherwise, mere inadequacy of consideration is no ground of equity for cancelling the bill of sale, and the other cir-

cumstances in the transaction established by the proof, do not make out a case for the cancellation of the deed. 1 Story's Equity, sections 244, 245; 1 Sugden on Vendors, 316, 327 ; Low vs. Barchard, 8 Ves. 133; Western vs. Russell, 3 Vesey & Beam, 187; Coles vs. Trecothich, 9 Vesey, jr., 234 ; Osgood vs. Franklin, 2 Johns. Ch. Rep. 23; 1 Dess. 250, 260; Seymour vs. Delancy, 3 Cowen's Rep. 446; Seymour vs. Delancy, 6 John. Chan. Rep. 222.

4. If the bill of sale is to be considered as a mortgage to secure money loaned, the complainant is only chargeable with the hire actually received by him for the time the slaves were hired out to others, and with a reasonable hire, while they were in his service ; and the account settled upon this principle, will exhibit a small balance against Fresh, instead of the balance of $367 in his favor allowed him by the decree. Head vs. Overton, 1 J. J. Marshall, 559.

S. T. GLOVER, for Appellee.

#### POINTS AND AUTHORITIES.

The appellee, by his counsel, insists that the bill of sale under the evidence contained in the record, must be regarded in equity, only as a mortgage, and in support of this proposition, he makes the following points :

1. A bill of sale absolute on its face, may, nevertheless, be proved by parol evidence to have been intended as a mortgage. See Tucker's Com. part 2d, 103; 4 John. Ch. Rep. 167; 1 Day's Rep. 133; 1 Paige, 48 and 202 ; 2 Caine's Cases, 124; 2 Cowen, 324, 246; 15 John. 555; 1 Wendell, 433; 6 John. Ch. Rep. 417.

2. The testimony of Anderson ought to be regarded as being as conclusive upon the question of the character of the instrument, as the testimony of any one witness can be against the answer of the defendant in chancery.

3. That Fresh did not wish to sell his negroes, and when advised by Anderson to do so, refused, but offered to put them in pledge—that they were worth 600 or 700 dollars each; that they could have been sold to negro buyers on the spot, and at the time of the alleged sale, at that price. The declaration of Anderson to Fresh, that any arrangement by which 600 dollars could be secured to him in four or five weeks, would do; the willingness of Anderson to make an arrangement to save all parties—the enormous disparity between the sum alledged to have been given, and the value of the property—the fact that Holmes was

deeply interested to save the land from sale; that he had no money to buy the land with, if it was sold; that he had no money to pay down for the negroes, and could not raise money save by mortgaging the negroes, to pay Anderson; the fact that Holmes, though he affected great unwillingness at first, eventually tells Anderson if he could be secured and had the money, he would advance it, taken into connection with Anderson's subsequent agreement to wait four or five weeks, are circumstances all going to corroborate the statements of Anderson, and in my opinion amply sufficient to overturn the most positive answer.

That such circumstances are entitled to great weight, may be seen from the following adjudged cases : In 5 Binney, 499, property worth $800 was sold for $200, with a defeasance to recovery, if paid in three months; Scriviner considered the instrument a mortgage, and it was so held; 3 Dana, 175; 3 Dana 253; 7 John. Ch. R. 43; 2 Am. Digest, p. 186, No. 15, citing Stuart & Porter, 67; 1 Porter's R. 355; 9 Dana, 120; 3 Iredell's Reports, 94; 2 Am. Dig. 238, No. 7, citing 3 Yeager, 513. See also 2 Call, 421; 2 J. J. Marshall, 115, 471; 4 Hen. and Mun. 101.

4. The grounds assumed by Mr. Holmes, that Fresh was in such distress, and under such strenuous necessity, that he was forced to sell to him at 600 dollars, is iniquitous, and cannot be used by him to repel the presumptions, otherwise arising in favor of Fresh, upon the evidence; 2 Atkins, 330; 2 Tuck. 427; 2 Leigh, 150; 2 Cowen, 170; 14 Vesey, 214.

5. If, from all the evidence adduced, the court has doubts as to whether the instrument was intended as a mortgage or sale, the rule of equity is, to incline in favor of the mortgage.  2 J. J. Marshall, 471; 3 Dana, 253; 3 J. J. Marshall, 354–5–6; 5 Littell, 86.

6. It was proper for the court to take an account of the hire of the negroes up to the date of the decree; 1 Paine's R. 202; 2 B. Monroe, 61.

Scott, J., delivered the opinion of the court.

This was a bill in chancery brought by Fresh against Holmes and others, in which it is alleged that Holmes became an endorser in bank for Fresh for the sum of $1000.  Holmes was secured against all liability by reason of his endorsement, by a deed of trust on all the complainant's land in Lewis county.  Afterwards, in March, 1840, Fresh being pressed with executions, issued on judgments whose liens were anterior to the deed of trust, which had been levied on the lands con-

veyed by the trust deed, solicited from Holmes a loan of a sum of money sufficient to satisfy the executions. The solicitation was made in less than an hour before the time appointed for the sale. Holmes declined making the loan, saying he had not the money. At this time Thomas L. Anderson, attorney for the creditors in the executions, influenced as well by a desire ta save him from entire ruin, as complainant supposed, as to preserve Holmes' lien on the land about to be sold, interfered and offered to Holmes that he would direct the return of the executions if he would advance the sum of $600. Holmes declared his inability to raise that sum immediately, but thought he could do so in 4 or 6 weeks, if he could be so long indulged, and undertook so to do if Fresh would give him security for its repayment by a lien on three negro men belonging to him. Fresh accepted this proposition, believ-it to bc beneficial both to himself and Holmes, and Anderson, their attorney, was directed to prepare an instrument witnessing the agreement, which should attach a lien on the negroes mentioned, in favor of Holmes,-so soon as he should pay the money. Anderson inquired of Holmes what sort of an instrument he would have; Holmes replied he would rather have a bill of sale, as he thought there would be less difficulty about it than any other sort of instrument. Anderson informed Fresh that the form of the instrument was a matter of no importance, that the intention of the parties would determine its effect, and although it was absolute on its face, yet it could be shown to be a mortgage, or security. With this understanding Fresh avers he executed the bill of sale, supposing that Holmes, so soon as his money, with interest, should be paid, would release all claim to the slaves, and insists that the instrument of conveyance was designed by the parties thereto as nothing else than a security for the payment of money; that it was so understood by the parties at the time of its execution, and it was repeatedly so declared at that time. Immediately after this transaction, Holmes asserted in conversation, that he had purchased the slaves absolutely for $600. That he had obtained an advantage over Fresh, in consequence of his embarrassment. That his motive in so doing was to compel Fresh to settle with him usurious interest amounting to 6 or $700, which he had exacted from him on a loan of $400, at the rate of 20, 25, 30, 35 per cent. The bill charges that the three slaves were worth $2500 at the time of the mortgages and are now worth that sum, or nearly so, and that at any time, and at any state of the market, more than $200 a piece could have been obtained for the slaves. In April, 1840, before the $600, or any part thereof was paid by Holmes, he instituted an action of replevin against Fresh for the slaves, with a view

to harrass and oppress him, and to constrain the payment of the usurious interest above mentioned. The slaves were replevied, and ever since have been in the possession of Holmes, or of persons claiming under him. Holmes recovered judgment in the action of replevin. The negroes, it is stated, were worth one hundred and twenty-five dollars a piece annually, and have satisfied the debt by their hires. The bill prays for general relief, and refunding of the costs in the action of replevin.

There was a demurrer to this bill, which was overruled, and thereupon the defendant, Holmes, filed an answer, in which he admitted the facts stated in the bill relative to his liability for Fresh as endorser in Bank. G. W. Hawkins was a co-security, and equally secured by the trust in the property conveyed. A saw-mill was on the land coveyed by the deed of trust, and the trust property was worth at least three thousand dollars. The truth of the allegations of the bill respecting the incumbrances on the property by prior judgments is admitted, as is the fact of the same being levied on and about to be sold. Holmes denies that Fresh ever proposed to him to advance any money to relieve the land secured by the deed of trust, but admits that Thomas L. Anderson, the attorney for the creditors in the executions, expressed to him a desire that he would aid his (Holmes) old friend, by satisfying the executions under which his property was about to be sold. Holmes replied that he had no inclination to assist Fresh; that but a few days since they had attempted to make a settlement, and Fresh threatened to take every legal advantage of him, and that he had lost all confidence in him. When Anderson alluded to his liability as endoser for the bank debt, Holmes informed him that he considered that he was perfectly secured against any loss on that score. Anderson complained of the want of punctuality in Fresh; the frequent disregard of his promises; his indulgence and disappointments, and expressed a determination to sell Fresh's property. Holmes told Anderson during their conversation, that if he had the money he might aid Fresh notwithstanding his conduct, but that he had not the money, and felt no inclination to trouble himself with the matter. Anderson proposed to Holmes, if he would pay the money in a short time he would return the executions. Holmes declined doing this, and there he alleges the matter ended, and he was determined to have nothing more to do with it than to become a bidder at the sale. He admits that he refused to advance money to Fresh, and positively denies that he ever did loan or advance money to him, whose repayment was to be secured by a lien on slaves. He had made an arrangement which rendered him easy on the subject of the

bank debt. Anderson, who had left him with a determination to sell the land, as he supposed, some time afterwards, and just be'ore the sale was to have commenced, came to him while he was in the court house in conversation with G. W. Hawkins, and said "go and buy Fresh's negroes." Holmes answered that he did not know that he wished to sell them. At Anderson's suggestion, however, he went to complainant, Fresh, and offered him $600 for his three negro men, which he would pay Anderson in the course of three or four weeks. Fresh accepted his offer. Holmes returned immediately to the court house with Hawkins, and in his presence communicated to Anderson the contract he had made, and requested him to write a bill of sale, which was done, and it was immediately executed and acknowledged by Fresh. He positively denies that there was any understanding between him and Fresh that the transaction should be deemed merely a security for the money agreed to be advanced. He made the purchase with a view to save himself from any loss he might sustain in consequence of previous dealings with Fresh. He denies that there was any understanding that Fresh should keep possession of the slaves. They were not present at the time of sale, but some considerable distance away. So soon as he returned home, he called on Fresh for the slaves, who informed him that they were absent at the time, but that he should have them the next day. On that day he went again to Fresh, who told him the slaves were away, but that he should have them next day. On the third day Fresh avoided him, and he finding no negroes, commenced the action of replevin in the bill mentioned, which resulted as is therein stated. The negroes are worth $1300.

A replication having been filed to the answer, the cause was set for hearing, and on trial, Anderson, the attorney, was examined as a witness, whose deposition is as follows :

"That he wrote the bill of sale, by which Holmes claimed the negroes; that in the spring of 1840, he had various executions against Capt. Fresh, in favor of various persons, and had his land levied on. On the day of sale, called on Mr. Fresh, to know what he intended to do—said he had not the money. I told him he must raise the money. Mr. Holmes, I understood, had a lien, as an endorser on part of said land levied on. I told Fresh, to see Holmes about raising the money; Fresh refused, because there was not a good understanding between them, and said he would have nothing to do with him. I told him that I would see Holmes—saw him—told him I wanted him to raise the money. Holmes told me he had not the money, and I think said, he would not raise it if he had, for there was a difficulty between them

about their money matters. After several conversations, in which I tried to persuade him to do it, Holmes did not consent. I then told Fresh, that if he would raise six hundred dollars, I would stop the sale—if paid in three or four weeks, would do me. Cannot say whether Holmes was present or not. Finally, there was an agreement between Fresh and Holmes, that Holmes, as I had offered, should pay me $600, in four or five weeks. Both told me about the agreement, and I accepted the same. I was called on to write the agreement about the negroes, and my impression is, that I asked Mr. Holmes, what kind of instrument I should draw, and that he said a bill of sale, as there would be less difficulty about it than any other. I told Mr. Fresh, it would make no difference what kind of instrument was drawn, as the intention of the parties, would give character to the instrument. I cannot say that Holmes was present and heard such statement to Fresh, but they were both in the court house at the time. I cannot say what the understanding of Mr. Holmes was, as to the instrument; mine was, that it was a mortgage. It was during court—my business was urgent and pressing, and it is impossible for me to recollect distinctly what occurred. I was anxious for Mr. Fresh to make any arrangements, for I did not want to sell his land nor injure Holmes and Hawkins. I advised Mr. Fresh to sell his negroes and raise the money. He said he would not sell them, but offered them to me to keep, until the money was paid. I refused to take them. I recollect no conversation, if any, that passed between Mr. Holmes and Mr. Fresh, at the time of drawing the bill of sale.

" My understanding was that the bill of sale was a mortgage—cannot tell how I derived that impression, but supposed that I did from the parties. It may be possible that I derived that impression from conversation with Mr. Fresh. Slaves about that time, were worth 6 or 800 dollars each—ready market at $600. As to the allegations in bill, my impression is, that I turned round and told Mr. Fresh, that it would make no difference what sort of an instrument was given, the intention gave character to the instrument. Whether Mr. Holmes heard, or not, I cannot say. My impression is, that he was present, but cannot be certain. I learned that Mr. Holmes had taken out a writ of replevin for said negroes, at which I was utterly astonished."

On cross examination witness said :

"That he supposed it would be the interest of Holmes to pay the money, as he was endorser. Holmes declined advancing money. I think I told him when I left him, that I would make a sale, for it was my intention so to do. Negroes not then levied on. I think it probable

that I advised Holmes to buy slaves, as I advised Fresh to sell. I saw George Hawkins present several times with Holmes that day. Fresh would not go to Holmes, and Holmes manifested no anxiety to interfere. I had indulged Mr. Fresh, and had returned executions several times, and was desirous of saving both Fresh and Holmes from injury. I heard nothing said about interest. I do not think that Holmes would hire money at six per cent. I thought he might advance money to save the security he had on Fresh's land. I had a conversation with Mr. Bryant—I may have told him it was a mortgage—think it probable ; if so, I meant a mortgage in law, not in form—don't pretend to recollect conversation—cannot say—would not deny that Holmes said to him after sale, " I have bought the negroes," though I have no recollection of it. Do not recollect the terms of the contract, nor the words spoken at the time. I was not present at the making of the contract. I understood it to be a mortgage—never dreamed of any thing else, but cannot tell how I derived that impression, except from the parties."

Hawkins, a witness, was likewise examined, who deposed as follows: " He was at Monticello, the time of sale of negroes from Fresh to Holmes. Mr. Holmes and witness had a deed of trust upon land levied upon by execution, of which Anderson was attorney, of older date than the deed. Anderson said to Holmes, "buy Fresh's negroes," Holmes said, " he won't sell them," Anderson said " I will go and see him." He went out—came back and told Holmes that Fresh would sell them. Mr. Holmes then went out—came back and said he had bought them, and called upon Mr. Anderson to write the instrument. Then they walked into the bar—Mr. Anderson set down in the bar and wrote the bill of sale now before the court. Witness felt interested as endorser for Mr. Fresh in Bank, and anxious to secure himself from these executions. Allen Hawkins was to purchace land levied on, of Holmes, if Holmes should buy on execution. Did not see Fresh and Holmes together, before the sale that day. Heard Thomas L. Anderson ask Holmes to advance money, but Holmes said he had gone as far as he could for Fresh. Witness was present with Holmes when he went after the negroes, then working on the State road. Fresh told Holmes to come the next day and he would deliver them up. The reason given by Fresh, why he did not deliver them up, was, that they had gone to Newark. Suit in replevin was brought on the next day, or the day but one after. Fresh made no claims, nor said anything about its being a mortgage, or its being a loan of money.

Cross examined.

"I state the substance and sometimes the words of the conversation

detailed. Anderson wanted Holmes to help Fresh, which he refused. Anderson then told Holmes to buy Fresh's negroes. Holmes said, "He will not sell," or words to that effect. Then Anderson said, "I will go and see." Anderson went and saw Fresh, and returned in about five minutes, and said, "Mr. Fresh will sell." Anderson went but once to see Fresh. Anderson said he would not wait fifteen minutes before he sold—said he would wait on Holmes a few weeks for the money. Witness had no interest in the purchase of the negroes. Witness is the particular and intimate friend of Holmes.. It was not long after sale before he was ordered to sell on the deed of trust. Can't now state the amount of land levied on—knows that the mill tract was levied on, as he had an interest in it—the land levied on, 5 or 6 eighties, was subject—$1000 due Bank—a deed of trust to Holmes—about $1200, and Anderson's executions. Holmes got the money to pay the $600 to Anderson, of Mr. Bryan, who advanced on two of the negroes $800,—this was shortly after the sale. Allen Hawkins is now in Kentucky. At the time of the sale, he had two or three hundred dollars. It is proper for me to state, that Holmes, the defendant, told me that I was mistaken about my statement, that Anderson went to see Fresh, to know if he would sell the negroes. Holmes says, that he, Holmes, went to see Fresh himself, that Anderson did not go. I think Anderson and Holmes both mistaken. I was trustee for Holmes, and his surety in the replevin bond, in the suit at law, for the same slaves."

The negroes were worth from $1800 to $2000, and would have hired during the different years for different sums—one year for as much as $125 a piece, another for not more than $75. On the hearing, a decree was rendered in favor of Fresh for $367 67. Holmes was ordered to to deliver up the slaves to Fresh, and the bill of sale ordered to be cancelled. From this decree Holmes appealed to this court.

From the view we take of this subject, it is not necessary to determine the question, whether a conveyance, absolute in its terms, may, under all, and any circumstances, be shown to have been intended as a security for the re-payment of money, or whether it can only be done in those instances in which it is alleged that the instrument has been drawn in a manner contrary to the intention of the parties, through fraud or mistake.

From the evidence in the record, it does not appear that Holmes ever intended, or consented that the instrument whose nature is involved in this controversy, should be a security for the re-payment of money. Such may have been the understanding of Fresh, and such was the understanding of the witness, Anderson, who had an agency in the nego-

tiation of the contract, but in order to affect an agreement, the concurrence of two minds is necessary ; it is not sufficient that one party to an instrument of conveyance absolute in its terms, intended it as a mortgage; in order to make it so, such must have been the understanding and intention of the other party likewise to produce that effect. Although Fresh believed he was executing a pledge, or mortgage of the slaves, when he put his name to the bill of sale, yet his understanding of the nature of the transaction, cannot avail him anything, unless he can show that it was communicated to Holmes, and assented to by him.

Independently of the evidence of Anderson, there are but two circumstances of any weight, which conduce to show that the bill of sale was intended by the parties as a mortgage. These are, the great inadequacy of the price given by Holmes for the slaves, and the fact that Holmes was interested in having the executions against the land satisfied without a sale of it, as he had a lien on the same land, subsequent in point of time, to that of the judgments on which the executions had been issued.

Holmes himself says, he was not uneasy about his lien on the land, he declares that he had made arrangements in relation to that matter, which had relieved him from all apprehensions of loss. Nothing is shown which disproves this allegation; on the contrary, circumstances corroborate its accuracy. Those to whom Holmes applied for money were willing to let him have it, and although the sums offered by them were small, yet their willingness to lend, shows the character for fidelity to his undertakings, enjoyed by Holmes; and the fact that Anderson was willing to take his word for the payment of six hundred dollars, in four or five weeks, without any security, whilst it establishes his character for punctuality, shows also, that although he might have been without money at the time of sale, yet he was in no danger, as his promise to pay a short time afterwards, was sufficient to cause a return of the executions. We all know the value of a reputation for punctuality to our engagements, and experience shows how powerful an agent such an attribute is, in procuring relief when we are under pecuniary embarrassments. If the land had been sold, the negroes would have remained liable for the debt for which Holmes was bound for Fresh. These considerations incline us to the belief, that Holmes was not under any great apprehensions of loss, in the event of the land having been offered for sale.

As to the inadequacy of price, it must be conceded that some of the State courts have held, that it was of itself sufficient to convert an

14

absolute conveyance into a mortgage. In a question whether an instrument was a mortgage, or conditional sale, the inadequacy of price has been held conclusive, as to the character of the instrument. Thus in the case of Conway's executor's against Alexander, 7 Cr. 218, it was said by Chief Justice Marshall, that excessive inadequacy of price, would of itself, in the opinion of some of the judges, in the case of a conditional conveyance, furnish irresistible proof, that a mortgage, and not a sale, was intended. This, however, was not the opinion of the court. The weight of authority clearly inclines to the opinion, that mere inadequacy of price itself, unless it be so gross and manifest, that it cannot be stated to a man of common sense, without an exclamation at the inequality of it, would not induce a court to set aside a contract to which there was no other objection. Powell in his valuable treatise on contracts, speaking on this subject, says, "inadequacy of price, abstracted from all other considerations, seems of itself, upon revision of the best authorities, to furnish no ground on which a court of equity can relieve a party to a contract, the law of England having never fixed any certain proportion, that the price should bear to the thing purchased," 2 Pow. 152.

If the two foregoing circumstances will not justify us in regarding this bill of sale as a mortgage, we will next advert to the question, whether when taken in connection with the evidence of Anderson, they will have that effect. In the consideration of this proposition, it must be borne in mind, that the answer of Holmes, the defendant, being responsive to the bill, can only be overthrown by the evidence of two witnesses, or one witness with strong corroborating circumstances. That answer must be taken as true, unless its falsity is demonstrated in the manner thus pointed out. Holmes asserts positively, that he never agreed to receive any other instrument of conveyance than an absolute bill of sale. Anderson no where in his deposition, avers positively, that Holmes knew that it was the intention of Fresh, that the transaction should be a mortgage. Of some things in connection with this matter, he speaks positively, in such a manner as to leave no doubt on the mind, that he is convinced of the existence of the facts, about which he is testifying. But it is remarkable, that throughout his whole history of this affair, whenever he speaks of the knowledge of Holmes, respecting the nature of the agreement, his assertions are accompanied with qualifying phrases, which detract very much from their force, and infuse into the mind doubts, as to the knowledge of Holmes of the fact, that Fresh intended the bill of sale as a mortgage. If a witness speaks with diffidence, and a mistrust of his mem-

ory of all the facts about which he testifies, more reliance could· be placed upon his narration, than on facts testified to doubtingly in a story, when the existence of some other circumstances is asserted with assurance, and that of others with uncertainty, especially if those about which there is any doubt, are as important as those concerning which there is none. Anderson may never have dreamed that the instrument was intended as any other thing than a mortgage, but still that does not show that Holmes knew it was so intended. He says he was astonished when he heard of the action of replevin instituted by Holmes, to obtain possession of the slaves. But Fresh himself, if the witness may be believed, was not astonished. He made no complaint when the slaves were demanded, but promised to deliver them again and again, and failed to comply with his engagements, before suit was commenced. It is not very strange that Holmes, who is represented as a "hard man, reaping where he has not sowed, and gathering where he has not strewed," exacting 20, 25 and 30 per cent. for the loan of money, should have agreed to advance $600, without any stipulation respecting interest, and without even taking a security evidencing the existence of the debt. The fact that he had an interest in having the executions satisfied without a sale of the land, need not have prevented him from making a good bargain with Fresh, for the use of his money. Whatever Holmes' anxiety on the subject may have been, Fresh's was ten fold greater, and the unfortunate man seems to have been in that situation, that it could not be said he was master of his own conduct. In the case above cited from Cranch, in which the dispute was, whether the contract was a conditional sale or mortgage, Ch. Jus. Marshall says, "the want of a covenant to repay the money, is not complete evidence that a conditional sale was intended, but it is an important circumstance, for it is a necessary ingredient in a mortgage, that the mortgagee should have a remedy against the person of the debtor, either reserved in express terms, or somehow existing." It is not pretended that the mortgaged property was, under the contract, to have been delivered to Holmes, as at once an evidence of his debt, and the security for its repayment; so far from it, the witness testifies that he was astonished when suit was brought by Holmes, to obtain possession of the slaves. It is admitted on all sides that there was a misunderstanding between Holmes and Fresh, such an one as prevented any hopes being entertained by Fresh, that Holmes would render him any assistance. The enquiry spoken of by Anderson, and on which so much stress was laid by counsel, as having been put to Holmes when about to draw the bill of sale, is open to the observations

above made on his testimony.  He speaks positively about Fresh's understanding of the contract, but when he comes to Holmes, his language is changed, and he only has impressions as to Holmes' knowledge of the agreement.  A witness testifies that Anderson directed Holmes to go and buy Fresh's negroes.  Fresh himself refused to see Holmes on the subject of raising the money to satisfy the executions. Anderson says he cannot say what Mr. Holmes' understanding was, as to the nature of the instrument.  After the most deliberate consideration of this matter—after weighing the evidence with that care that the importance of the controversy demands, we have been unable to come to the conclusion that Holmes never understood, or was informed, before the execution of the bill of sale, that it was designed as a mortgage. Such a character can only be given to the instrument, by an interpolation into our code, of the principle that mere inadequacy of consideration will convert an absolute conveyance into the security for the repayment of money.  The evidence that would produce this effect, should be clear, and such as leaves no doubt on the mind.

It has been said that mere inadequacy of price, abstracted from all other considerations, is not sufficient to induce a court to afford relief against a contract or to set it aside.  If a person with his eyes open will make a bad bargain, he must suffer by his own imprudence; he has no right to complain, no title to apply to equity for relief.  But this circumstance when connected with others, which show that the person did not understand the bargain he made, or was so oppressed that he was glad to make it, knowing its inadequacy, will show a command over him, which amounts to fraud.  Newland on Contracts, 539.  In the case of Osgood against Franklin. 2 J. C. Rep. 24, Chan. Kent says, "the doctrine is settled, that in setting aside contracts on account of inadequate consideration, the ground is fraud, arising from gross inequality."  Unless the inadequacy does of itself, *ex evidentia rerum*, prove fraud, the rule is, says Chief Baron McDonald, that inadequacy by itself, has not the weight suggested.  If indeed advantage be taken on either side, of the ignorance or the distress of the other, it affords a new and distinct ground, not applicable to this case, and a very great inadequacy may form a presumption of oppression.  1. Wighticks Rep. 28, 29, Cows vs. Heaps, 3 Ves. & Bea. 117.  The same doctrine is maintained in the case of Nelson vs. McDonald, 6 J. C. Rep. 211. These principles when applied to the circumstances of the case now under consideration, would warrant us in extending some relief against the oppressive contract, into which Fresh has been forced by his pecuniary embarrassments and distress.  The great inadequacy of the price

received for the three slaves, being less by $1200 than their real value, the fact that a large and valuable landed estate, on which great sums of money had been expended, was on the eve of being sacrificed—that the defendant had the complainant in his power by virtue of a deed of trust, the money secured by which it apppears from the evidence, was then, or in a short time due—the misunderstanding of the parties in relation to the nature of the contract, are circumstances which would justify a court of equity in setting aside this conveyance.

As to the objection, that the prayer of the bill is not for this species of relief, it may be answered, that there is a prayer for general relief, under which a court will make any decree warranted by the allegations and proofs in a cause. The allegations of the bill afford an ample justification for this course. The case of Hepburn & Dundas vs. Dunlop, &c., 1 Wheaton 179, is one showing the liberality of courts in extending relief under the general prayer.

The decree of the court below is reversed, and it is ordered, adjudged and decreed, that William H. Holmes, the defendant deliver up to James Fresh, the complainant, the said three slaves, viz: Abram, Ben and David, so soon as the said Fresh shall pay to him the sum of six hundred dollars; and that the said Holmes deliver to the said Fresh, the said bill of sale, to be cancelled, and that Holmes pay the costs of this suit incurred in the court below, and that Fresh pay the costs in this court.