COBB *et al., Appellants,* v. DAY.

DIVISION TWO.

1. **Absolute Conveyance :** MORTGAGE. A conveyance intended as a security for a loan, though absolute in form, will be treated as a mortgage.

2. ——— : ———. : PAROL EVIDENCE. Parol evidence is competent to show the intention of the parties and the real character of the transaction.

3. ——— : ——— : BURDEN OF PROOF. While the burden of proof is ordinarily on the person alleging the absolute deed to be a mortgage, yet it is otherwise where the transaction had its inception in an application for a loan.

4. ——— : ——— : EVIDENCE. Inadequacy of price, the grantor's remaining in possession, and his making improvements, are circumstances tending to prove the conveyance was intended to be a mortgage.

Cobb v. Day.

5. ——— : ——— : ———. So the fact that the grantor understood the conveyance to be intended to operate as a mortgage is a circumstance for the consideration of the chancellor.

6. **Agency** : EXCESS OF AUTHORITY. One may be bound by the acts of his agent, though he exceeds his powers.

7. **The Evidence** examined and *held* to show by its weight that the conveyance executed in this case, though absolute in form, was really a mortgage.

*Appeal from Jackson Circuit Court.*—HON. J. A. ' SLOVER, Judge.

REVERSED AND REMANDED.

*R. O. Boggess, Milton Moore* and *E. G. Vaughan* for appellants.

(1) The doctrine is well established in this state that a deed absolute in form may be shown to be a mortgage. *Worley v. Dryden*, 57 Mo. 226 ; *Turner v. Kerr*, 44 Mo. 429 ; *Sharkey v. Sharkey*, 47 Mo. 543 ; *Newel v. Keeler*, 13 Mo. App. 189 ; *O'Neill v. Capelle*, 62 Mo. 202. (2) The transactions out of which this suit grew commenced with an application for a loan, and terminated in the execution of an absolute deed. It should be scrutinized closely, and if there be any doubt as to the intent of the parties, this doubt should be resolved in favor of the plaintiffs. *McDonald v. McLeod*, 1 Iredell Eq. 221 ; *Fiedler v. Darin*, 50 N. Y. 437 ; *Owen v. Blake*, 44 Ill. 135 ; *Philips v. Hulsizer*, 20 N. J. Eq. 308 ; 1 Jones on Mortgages, sec. 266. (3) The amount advanced—not half the value of the property at the time of the execution of the deed to Day—proves that a loan was intended and not a sale of the property. *Campbell v. Dearborn*, 109 Mass. 130 ; *Freeman v. Wilson*, 51 Mo. 329 ; *Steel v. Black*, 3 Jones' Eq. 427 ; 1 Jones on Mortgages, sec. 275 ; *Sweet v. Parker*, 22 N. J. Eq. 453 ; *Peugh v. Davis*, 96 U. S. 332 ; Devlin on Deeds, sec. 1133. (4) The plaintiff retained possession of the

property, paid taxes, and made improvements thereon. These things were inconsistent with the idea of an absolute conveyance. *Cousins v. Wall*, 3 Jones' Eq. 43 ; 1 Jones on Mortgages, sec. 274 ; *Bennett v. Holt*, 2 Yerg. 6 ; *Clark v. Finlon*, 90 Ill. 245 ; *Hoffman v. Ryan*, 21 W. Va. 415. (5) The property involved in this action belonged to the plaintiff, Emma Cobb, and her intention upon the delivery of the deed must govern. *Davis v. Brewster*, 59 Tex. 93. (6) It is immaterial what the purpose of Day was, or what instructions he gave his agent, if the minds of the parties did not meet; that is to say, if the plaintiffs delivered the instrument to stand in the place of a mortgage, and not as an absolute deed, then the plaintiffs are entitled to redeem. Mr. Parsons says in his work on contracts, volume 1, seventh edition, top page 475 : "There is no contract unless the parties thereto assent ; and they must assent to the same thing in the same sense." (7) The relation of the parties and their financial circumstances, with other evidence introduced at the trial, should be considered. (8) The court erred in allowing the letter from Day to his wife, of date September 24, 1881, to be read in evidence. The evidence shows that it was not seen by the plaintiffs. They are not bound by the secret instructions of the defendant to his agent. *Minter v. Railroad*, 41 Mo. 503 ; *Garretzen v. Duenckel*, 50 Mo. 104 ; *Kinealy v. Burd*, 9 Mo. App. 359 ; *Crews v. Garneau*, 14 Mo. App. 505. (9) Assuming that Mrs. Day was a special agent, and that she exceeded her authority in permitting the deed in question to be taken as a mortgage instead of an absolute and unconditional conveyance, the defendant cannot reap the fruits of the acts of his agent and reject their burdens. *Palmerton v. Huxford*, 4 Denio, 166 ; *Menkens v. Watson*, 27 Mo. 163 ; *Kinealy v. Burd*, 9 Mo. App. 359. The defendant cannot repudiate the act of his agent without restoring plaintiffs to their original situation. *Norton v. Bull*, 43 Mo. 113–16.

*John S. Blackwell* and *Withers & Strother* for respondent.

(1) In order to have a deed, absolute upon its face, declared a mortgage, the proof must be so clear, strong and unequivocal as to banish every reasonable doubt from the mind of the chancellor as to the facts relied on. *Worley v. Dryden,* 57 Mo. 226; *Ringo v. Richardson,* 53 Mo. 385; *Rogers v. Rogers,* 87 Mo. 257; *Philpot v. Penn,* 91 Mo. 38; *Schradski v. Albright,* 93 Mo. 42; *Allen v. Logan,* 96 Mo. 591; *Adams v. Burns,* 96 Mo. 361; *Burdett v. May,* 100 Mo. 13. (2) The deed is always the best evidence of the intention of the parties, and is *prima facie* evidence of the verity of its contents. *Ringo v. Richardson,* 53 Mo. 385, 396; *Worley v. Dryden,* 57 Mo. 226, 232; *Allen v. Logan,* 96 Mo. 591, 601. (3) The burden of proof is upon the party who alleges the absolute deed to be a mortgage; and a mere preponderance of the evidence is not enough. *Worley v. Dryden,* 57 Mo. 226, 232; *Ringo v. Richardson,* 53 Mo. 385, 395; *Rogers v. Rogers,* 87 Mo. 257. (4) Evidence of defendant's verbal admissions is to be received with great caution. *Johnson v. Quarles,* 46 Mo. 423; *Ringo v. Richardson,* 53 Mo. 385; *Worley v. Dryden,* 57 Mo. 226; *Burdett v. May,* 100 Mo. 13. (5) The payment of the taxes for the years 1881 and 1882 by plaintiff is nothing more than was his duty under the covenants of his deed and the provisions of the law. 2 R. S. 1879, sec. 6685, p. 1310, as amended by Acts of 1881, sec. 1, p. 178; 2 R. S. 1879, sec. 6705, p. 1315, as amended by Acts of 1881, sec. 5, p. 180; *Blossom v. Van Court,* 34 Mo. 390. (6) The evidence as to the value of the land at the date of the execution of the deed was conflicting, running all the way from $40 an acre to $150 an acre. And, even at the latter figure, there was no such gross inadequacy of price as would authorize the granting of the relief prayed for, or warrant the presumption that the deed was a mortgage,

against the form of the deed and the answer of defendant. *Phillips v. Stewart*, 59 Mo. 491; *Worley v. Dryden*, 57 Mo. 226, 233. (7) Mrs. Day was the special agent of her husband, and as such had limited authority, and plaintiffs were bound to take notice of the extent of her authority. Story on Agency [5 Ed.] sec. 71, p. 18; sec. 19, p. 19; sec. 126, p. 146, note 3; sec. 127, p. 147, note 1; sec. 133, pp. 153–155; Smith's Mercantile Law [3 Ed.] p. 173, and cases cited in note *c*. (8) Mrs. Day's paying the money to plaintiffs did not warrant any inference that she was an agent for any other purpose. *Anderson v. Volmer*, 83 Mo. 403. (9) Plaintiffs brought their bill setting up an agreement with defendant that the deed should be regarded as a mortgage. That they have failed to establish such agreement is clear. They, therefore, seek to rely upon a ratification without having pleaded it. This could not be done, even had there been a ratification. *Bank v. Armstrong*, 62 Mo. 59; *Wade v. Hardy*, 75 Mo. 394, 399; *Noble v. Blount*, 77 Mo. 235, 242; *Webb v. Allington*, 27 Mo. App. 559, 571. (10) There can be no ratification without full knowledge of all the material facts on the part of the party sought to be charged. *Middleton v. Railroad*, 62 Mo. 579; *Cravens v. Gillilan*, 63 Mo. 28; *Bank v. Gay*, 63 Mo. 33; *Holmes v. Board of Trade*, 81 Mo. 137; *Nichols v. Burns*, 37 N. W. Rep. (Dak.) 752.

THOMAS, J.—This is a bill in equity to have a deed absolute on its face declared a mortgage and to redeem. The deed covers five and a half acres of land lying within half a mile of Kansas City. The bill alleges that on the twenty-ninth day of September, 1881, defendant loaned Emma Cobb, the wife of her coplaintiff, the sum of $330, which sum she and her husband agreed to repay to defendant, with ten-per-cent. interest per annum; that, to secure the payment of said sum and interest, they, on that day, conveyed the property to

defendant by a deed of general warranty; that this deed, though absolute in form, was intended by the parties as a mortgage to secure to defendant the repayment of said sum and interest. Plaintiffs offer to pay into court the amount the court may find to be due defendant, and pray to be permitted to redeem.

Defendant answered, denying that the deed was intended as a mortgage, and averred that it was what it purported to be, an absolute conveyance. A trial resulted in the dismissal of the bill, and plaintiffs have appealed.

We think the evidence in this record shows that the deed in question was intended as a mortgage, and plaintiffs ought to be permitted to redeem. We will consider the evidence in its order. Emma Cobb and defendant's wife are sisters. Cobb and his wife are what we ordinarily term bad managers. They were very poor, and had a large family of children. Day seems to be a very prosperous business man, and was and is in easy circumstances. He lived, in 1881, at Wellington, in LaFayette county, but did business in St. Louis. In March, 1878, Henry C. Cobb bought the land in dispute from H. H. Ratliff, for $330, and the latter signed a written contract giving the former three years in which to pay this sum; Cobb took possession of the land and made some improvements on it, but at the expiration of three years, in March, 1881, he had not been able to do more than pay the interest on the sum he agreed to pay, and the taxes on the land; the written contract was destroyed, but Ratliff verbally gave Cobb another year to pay for the land; plaintiffs began to make exertions to raise the money, and Mrs. Cobb applied to her sister, Mrs. Day, to induce her husband to advance and finally he did advance it, and it was paid to Ratliff, September 29, 1881, and thereupon the latter conveyed the property to Emma Cobb, who, with her husband, immediately conveyed it by warranty deed to defendant; plaintiff, Henry C. Cobb, took both deeds and had

them filed for record, paying the recorder's fees for both, himself; and plaintiffs continued to live, and still live, on the property. The controversy is over the deed made by plaintiffs to defendant, dated September 29, 1881. Plaintiffs contend that defendant advanced the money as a loan and that this deed was intended as a mortgage to secure it, while defendant's contention is that he bought the land, and the deed was what it purports to be, an absolute conveyance. There is a conflict in the evidence as to the nature of the transaction, and what the intention of the parties was. Defendant's wife attended to the matter for her husband.

Her authority in the premises is evidenced by the following letter:

"St. Louis, September 24, 1881.

" *Dear Sallie:*—I just received your letter, and was glad to hear from you and that you were all well. I am enjoying first-rate health. I am doing tolerably well here. In your letter you still ask me to help Emma buy her place, in an Em's letter inclosed, also asking you to get me to let her have the money, and stating she would be turned out in the big road in a few days if she did not get help, and that she had tried so hard to get help, but failed ; and in her letter she says if you can't get me to let her have the money, to get me to buy the place, and let them live on it, and they will keep the place up in good repair and improve it. Now, in reply, you have been after me for the last five or six months to let them have the money, and I have refused repeatedly, and every time you have asked me I have told you I wouldn't let them have the money, and I don't think you ought to ask me any more, for I have already done enough for them, but for your sake I will buy the place and let them live on it if they will keep the place up, if they are perfectly satisfied for me to buy it ; and inclosed I send you Morrison Wentworth's bank check, with my name signed to it, and you can go to Kansas City, and if they are perfectly satisfied for

me to buy the place, and let them live on it, you can fill up this check for the amount that is needed ; and if they are not satisfied to do this don't use the check, and come back home, for I haven't hardly the money to spare out of my business any way. I don't know when I will be at home. Love to all.

"Yours affectionately.

"Lewis H. Day.

"Don't pay over $350 for the place."

After receiving this letter she went to plaintiffs' home on the land in dispute. She and plaintiffs testify as to what occurred there : That Mrs. Day did not read the above letter to the Cobbs is conceded. She says she told them, however, explicitly what it contained, but they deny this. Mrs. Cobb testified as follows: "Mrs. Day came and told me that she come to let me have the money for the place. I told her I was mighty glad. She said she wanted a deed to secure it. I told her I would give it—I would give a mortgage; and she said : 'Why, you are not afraid to trust us ; why not give a deed ? ' I said, 'No ;' and she said : 'That is the only way that Mr. Day is willing to let you have it.'

"Q. What did you do—go on and state the conversation ? A. I told her, 'No, I was not afraid to trust her,' and I certainly was not—that I didn't think, as well off as they were, that they would try to rob me, and my house full of little children, and I told her that, if that was the only way she was willing to loan it, I supposed I would have to make a deed to her, and when my husband came I asked him what he thought about it, and he said to leave it with me ; that if that suited me it was all right.

"Q. She required a deed to the land in Mr. Day's name ? A. Yes, sir. Just to stand as security. She said I could pay it back whenever I could. But she advised me to pay it as soon as I could, for Mr. Day required ten-per-cent. interest on his money.

"*Q.* Then she told you that Mr. Day would not take a mortgage? *A.* She said, 'You are not afraid to trust us?' 'Why,' she said, 'We would not have this little place; we have five fine farms.' I told her 'No, I would not make a deed.' I says, 'If you will take a mortgage, I will make it.' Those were my exact words.

"*Q.* She didn't change her opinion about making a mortgage? *A.* No, she said it would be just the same as a mortgage, and I could pay it whenever I could. I told her then, 'I am going to pay for it as soon as I can,' and she said, 'That will be all the better for you.'

"*Q.* How long was it understood between you and Mrs. Day that you had to pay for the place? *A.* Well, I told her, 'I am going to pay you as much as $100 a year, if possible.' She says, 'The sooner you pay for it the better for you.' That was all the agreement there was.

"*Q.* There was no other agreement? *A.* No, sir; she says then to me, she says, 'Now if this property —if the interest on the money on the loan made runs up, would you be willing to give it up at the end of the time?' I told her, 'Yes, if the interest and the money you loan me eats it up, I will give it up without a word.'

"*Q.* She would not let you have the money until you did agree to do that? *A.* Yes, sir; she said to make her a deed in place of a mortgage, and she would loan me the money, but it was the understanding that it was to stand just as a mortgage, and they would take the money as we could pay for it.

"*Q.* Didn't your sister tell you that Mr. Day would not loan the money upon the land, but he would buy the land and take a deed for it? *A.* Not a word about buying or selling. She just remarked that she would not have it—they didn't want it; and when I said I would rather not make a deed, she said: 'You surely ain't afraid to trust us? Why, we would not

have this little piece of land.' Just that conversation— not a word about buying."

They went to the office of Tichenor where the deed from Ratliff to Mrs. Cobb was executed, and while there Mrs. Cobb testified that Ratliff said to her in the presence of Mrs. Day, "Now, if you want to sell this piece of land, I can sell it for you before sundown, for $100 an acre," to which Mrs. Cobb replied, "No, I don't want to sell it, Mr. Ratliff, I bought it for a home."

As to this conversation Mr. Ratliff testified: " Q. After the deed was executed, did you make any statements to Mrs. Cobb about the value of the property or what she could get for it? A. Yes, sir; I told her she could get $100 an acre for it before sundown if she wanted to sell it.

"Q. Did you hear Mrs. Cobb saying anything about keeping the property as her home? A. Well, she said she wanted it for a home at the time I mentioned selling it for $100 an acre; she said she did not want to sell it, she wanted it for a home."

Henry C. Cobb testified that he told Boggess, in the presence of Mrs. Day, that "he wanted to give a copy of that deed to Mrs. Day to make her secure for $330 he had borrowed from her to pay on that piece of land. He asked witness if that was not a queer way to do it."

Mr. Boggess, who wrote the deed now in controversy, testified that the Cobbs and Mrs. Day came to his office after the deed to Mrs. Cobb had been executed, and as to what occurred there he said: "I learned that they had that day closed up a transaction and got this deed from Ratliff and wife and that Mrs. Day had brought the money up and furnished it for the purpose of paying that consideration; and they said they wanted a deed made for the purpose of securing Mrs. Day or Mr. Day for that money. My recollection is somewhat dim, but I think I said it was rather a dangerous way to secure money, and that they ought to make a deed of trust.

Then it was that I learned that the two ladies were sisters and were willing to trust each other."

Mrs. Day's version of the transaction is as follows:
"*Q*. Now what conversation did you have with your sister upon the premises connected with the land? State what you told her with regard to your instructions from your husband. *A*. I told her just what was in the letter exactly, and she objected to it. She wanted me to loan her the money and take a mortgage. I told her I could not do it; that wasn't my instructions. She insisted on it, and Mr. Cobb got very indignant and swore about, and walked out of the room.

"*Q*. Where was that? *A*. In Mr. Cobb's room, in the house.

"*Q*. Out on this place? *A*. Yes, sir.

"*Q*. What was said there, finally, about the matter? *A*. Well, we talked it over for some time, and they insisted that I could loan the money and take a mortgage if I wanted to; that Mr. Day could not help himself; that I had the check and I could give it. I told him I would not do that. After we talked it over they said that I could not get it that way; that Mr. Ratliff would not sell it to me for that amount of money; that he had promised it to her for a certain price, but that he would not sell it to anyone else? I said 'Well, why is all this talk then; you might have said that at first and saved these hard feelings; I will go back as I came.' They didn't want me to do that, and she said, 'If I cannot have it otherwise, I would rather Mr. Day would have it than anybody else; he has done more than anybody for us, and I know he won't turn us out.' I told them that I would promise them that he would do that, and he has done it ever since, and would have done it the length of their lives.

"*Q*. Why was the deed not made by Mr. Ratliff and his wife directly to Mr. Day? *A*. Because they said Mr. Ratliff would not let him have the place for

$330, and in the postscript to that letter Mr. Day said he would not go over $350.

"*Q.* What was said about notes and ten-per-cent. interest? *A.* There was nothing said about a note or ten-per-cent. interest that day. There was before I left their house; before that they asked if Mr. Day bought the place would they let them redeem it? I told them I could not say.

"*Q.* Was that before the deed was made? *A.* Yes, sir.

"*Q.* Well, I am talking about the final agreement. *A.* Well, they told me not to tell anyone it was Mr. Day's place; that they had been trying to get it for a long while and they didn't want people to know it was Mr. Day's. I told them I would do that if it was any satisfaction to them.

"*Q.* When the first deed was made, Mr. Ratliff and yourself were present? *A.* Yes, sir; he was in the room."

There seems to have been some contention about the party to whom Ratliff should convey the land. Mrs. Day says it was suggested to have the deed made to Mr. Cobb and then have Cobb convey to Day; but she objected to this and Mr. Cobb wanted to know why she objected, and as to this point Mrs. Day testified: "When she asked for my reasons, I told her because he had never paid anything back. When she pressed me for an answer, I gave that reason; she says: 'Well, if you cannot trust him, you can trust me,' and she took a solemn vow that, if I would let her buy the place from Mr. Ratliff, she would immediately make another deed to Mr. Day. That is just how it was done."

She denied hearing the conversation with Boggess, which he says the parties had, and she says she did not hear Ratliff tell Mrs. Cobb that she could sell the place

VOL. 106—19

for $100 an acre before sundown if she wanted to, and her reply that she did not want to sell, but wanted it for a home.

Plaintiffs continued to live on the land and made improvements on it to the value of $200. They raised fruits and vegetables on it for sale, and sold some milk from cows they kept. They paid the taxes on the property for the years 1881-2, and defendant paid the subsequent taxes. In two or three years after this deed was made, defendant moved to Kansas City, where he engaged in buying and selling real estate. Plaintiffs claim that they let defendant have fruits and milk from time to time in payment of interest on the debt, but this is denied by defendant and his wife. Plaintiffs were not able to give, even approximately, the amount of fruits and milk defendant got which were not paid for, while defendant swears he paid for all, or nearly all, he got.

On September 3, 1885, this suit was instituted. At that time the land had got to be worth $1,000 an acre. A few days before the institution of the suit plaintiff had an interview with defendant in regard to the land. They differ as to what occurred at that interview.

Cobb's account of it is as follows:

"*Q.* Now state to the court all that conversation. *A.* Well, I went down to Mr. Day's to sell him my place; he was dealing some in real estate, and, as he had been kind to me, I thought I would give him the first chance at my place. I went down and told him I was going to sell it, and he wanted to know why I wanted to sell it. I told him the reason was, I wanted to get money to pay him; I had his money about as long as I thought it right, and I could not pay him without selling. I wanted to sell the place to pay him off and take the rest of the money and go farther back into the country and get more land, where I could support my wife and children. Well, he said he had forty

acres down by Odessa, and he would give me the difference between the two—between what I owed him and my place. I asked him what the improvements were on it, and he said there was none; only about half of it was in cultivation, and I told him that I would be but little better off; that I had no money to build improvements. He said, 'Go ahead and look at it.' He says, 'If you like it, I will build a house on it.' And he says, 'I wish you would go right ahead, because I may have a chance to sell it to somebody else.' So I did. I went down the next day and looked at it, but I didn't like giving my place for it, and I went to see him, but he was not there, but I saw his wife and told her"— (Objected to. Objection sustained.)

"Q. Now, when did you talk with Mr. Day about it? A. I never had any more talk with him.

"Q. You never had any more conversation with him at all? A. No, sir."

Mrs. Cobb says:

"Q. What did Mr. Day say to you about selling the property? A. He went out to see if his horse was all right, and Mr. Day just said to me: 'Be sure you have a place to put your money before you sell;' that is all he said to me.

"Q. That is all he said to you? A. Yes, sir; he asked me also why we wanted to sell, and I told him we had those boys, and we wanted to get them out further, and he said: 'Be sure you have a place to put your money in a home before you sell.' That is about all."

Lewis Day Cobb, a son of plaintiffs, testifies about this conversation as follows: "Q. Were you with your father at the time he had the conversation with Mr. Day at his own house in regard to this Odessa land trade? A. Yes, sir.

"Q. Can you tell how that came around? A. Yes, sir. We went down to give them the first chance at the place; we wanted to sell it, and they offered us this piece of land.

"*Q.* How did you happen to go along at the time? *A.* Why I went to the doctor, and they offered us this piece for our piece, and help build us a house on it.

"*Q.* Mr. Day offered your father that? *A.* Yes, sir.

"*Q.* How is that now? *A.* Mr. Day offered my father his forty acres of land and help him build a house on it for this place here.

"*Q.* Do you know whether your father went to see that place or not? *A.* Yes, sir, he went down to see the land.

"*Q.* He left for that purpose? You didn't go with him? *A.* Yes, sir.

"*Q.* Where was this conversation or talk, where did it occur? *A.* At Mr. Day's house."

Defendant's version of it is this: "*Q.* What was said between you and Cobb at any time about an exchange of the land at Odessa for this place out there? *A.* None; only I told him if it suited him better he could go down there on it and give this up.

"*Q.* Now, what did Mr. Cobb say about disposing of the land? *A.* Well, I think there was something said about it, but there was not much said about it—he spoke something about it, but I was away, and I didn't know they made any claim on the land before.

"*Q.* When was the first time that you heard Mrs. Cobb claim that the deed she made was a mortgage? *A.* I think it was some time after this.

"*Q.* After what—after the deed? *A.* Well, I could not tell; after '85, I suppose; about the time they brought the suit.

"*Q.* How many conversations did you have with them about it? *A.* That is the only conversation I had with them from '81 until now.

"*Q.* State to the court whether or not you were still willing for them to live there as you stated. *A.* I never would have turned them off the place.

"*Q.* When, if at all, and in what conversation was it that you ever said to Mr. and Mrs. Cobb that you didn't own this land out there? *A. I think I never made such a statement to anybody.*

"*Q.* Well, he said, too, that he wanted to sell that land? *A.* I think he did.

"*Q.* The little boy was present and Mrs. Cobb, too, at that time? *A.* Yes, sir.

"*Q.* And then you said if he didn't like that he could go to Odessa and live there? *A.* Yes; I told him if he would give me possession of this, I would let him live there."

After this interview Mrs. Day went to see plaintiffs at their home. She·says she had heard plaintiffs were trying to sell the property, and when she got there she found a signboard up, with "This place for sale," on it, and she told them they had as much right to put that sign up on defendant's yard where he lived as they had to put it up there. She says also that her sister offered to redeem the place.

As to this interview Mrs. Cobb says: "You see, my sister came out after she told us—after she had made us an offer of the farm and we could not take it. She said that now, she would let me know that the place was theirs, and they were going to take it; and I told her it would be robbery, and that surely they didn't mean that; and she said they did. I went down and offered to pay her the money with interest, if she would take it. She said, 'I don't want to do that—I didn't do that for money;' that they intended to have the place. Then we brought suit."

Thomas H. Mahan testified: "*Q.* Do you remember having any conversation with Mr. Day about letting Cobb have the money on this place up there? *A.* Mr. Day had been up there to Kansas City, and I asked Mr. Day once if he ever saw Clay—I called him Clay, meaning Cobb. He says: 'Yes, I see him often.' I says: 'How is he getting along?' He says: 'Not very well;

I don't think he is doing much.' He says: 'He says he has got a little place up there, and ain't got it paid for.' He says: 'I let him have $300 on the place, and took a deed of trust for the money.' That is my understanding of what he said.

"Q. Where did that conversation occur? A. Over at the old hotel, under the steps going down from the porch.

"Q. Did he use the word 'mortgage' or 'deed of trust?' A. Well, I will tell you, I think to the best of my knowledge he said he had let Cobb have $300, and took a deed of trust for the money, and he hated to do it, he said, on account of he thought Cobb might not be able to pay it, and he hated to have to sell him out. That is all he said to me about it."

This conversation was in the fall of 1881 or 1882. Mr. R. R. Gillespie testified. "Q. Did you ever have any conversation with Lewis H. Day as to any business transaction between him and the plaintiffs? If so when? A. Yes, I had a conversation with Mr Day. It has been four or five or six years ago ; I cannot recollect the time exactly and cannot recollect the year it was in.

"Q. State the conversation. A. Mr. Day and I were on the road from Lexington. I asked Mr. Day as to where Clay Cobb lived ; I cannot say exactly what I asked him. He told me he lived at the same place he had lived at for a year or two before, and went on to say that his wife, Mrs. Cobb, had been writing to his wife that they were about to lose their place, and she, Mrs. Day, had written to him, L. H. Day, in regard to it, and that he had sent his wife a check, a blank check, and he stated that it cost him about $300 when it was made out, and that Mrs. Day had gone to Kansas City and taken a deed to the land ; he went on to say that if they, Cobb, ever got able to pay for it they were to have it back. That is about the end of the conversation. I do not know that I have given this conversation, word for word, but this is the substance of it.

Cobb v. Day.

" *Q.* State what Day said, if anything, as to his desire that Mrs. Cobb should have a home ? *A.* He said that if they ever paid him back his money they were to have it for a home."

Defendant denies having these conversations with Mahan and Gillespie.

I. A conveyance intended as a security at the time of its execution, though absolute in form, is treated as a mortgage. Such intention may be shown by parol evidence, on the ground that the denial of the trust character of the deed by the grantee is a fraud' on his part, which gives a court of equity jurisdiction of the case, and thus enables it to hold to the verbal or implied defeasance as effectually as if this had been a formal written one. *O'Neill v. Capelle*, 62 Mo. 202.

II. It is conceded by all the parties to this transaction that plaintiffs applied to defendant for a loan. Mr. Jones in his work on mortgages, fourth edition, section 266, says, " The parties having originally met upon the footing of borrowing and lending, although a different consideration be recited in the deed, it will be considered a mortgage until it be shown that the parties afterwards bargained for the property independently of the loan. But an application for a loan may, in any case, result in a sale of land absolutely or conditionally, and, because the transaction began with such an application, it is not to be concluded that it necessarily ended in a loan. The language of the courts, in some cases, would seem to imply that a court of equity would always allow redemption in such case ; but, although such transaction should be carefully scrutinized, when it appears that the negotiations resulted in a sale absolute or conditional, this will be supported."

On this same subject Mr. Devlin in his work on deeds, section 1118, says, "As the intention of the grantor in the beginning was to borrow money, the presumption is natural, unless an alteration of this intention is shown, that any transfer made of his

property, connected with negotiations for borrowing money, was made as security for a loan. And this is true, though a different consideration than the one first sought be recited in the deed. The parties having treated as borrower and lender, the conveyance will be considered a mortgage, unless it appear that they afterwards contracted for a sale of the property, without reference to the loan." And in section 1117 he uses this language: "Where a person who appears to be a grantor desired in the inception of the transaction to borrow money, and obtains the money, courts are inclined to say that the parties have made a mortgage, although the transaction may have assumed the form of a sale."

So we take the rule to be that the burden of proof is upon the party who alleges that an absolute deed is a mortgage, and that the proof must be clear and convincing. *Worley v. Dryden*, 57 Mo. 226. Yet when the transaction had its inception in an application for a loan, the courts are inclined to scrutinize it closely and to hold it a mortgage, unless it clearly appears the parties changed their minds afterwards.

The title to this property was still in Ratliff. The weight of the evidence is that it was worth at the time this deed was made $600 or $700. It constituted the homestead of plaintiffs. They had seven months' more time to pay Ratliff for it. The deed recites a consideration of $330, the exact amount paid Ratliff. There seems to be no reason on earth why plaintiffs should want to have the land transferred to defendant, unless it was to get more time to pay for it than they supposed Ratliff would give them. Plaintiffs swear most positively that, though they were forced to make an absolute deed, yet it was explicitly agreed that it should operate only as a mortgage. While Mrs. Day is very emphatic that she refused to take a mortgage, and insisted on and obtained an absolute deed, she is not very emphatic about plaintiffs' right to redeem. She

says that, when they asked her if she thought Mr. Day would allow them to redeem, she replied she did not know what he would do.

The property was worth twice as much as defendant advanced on it. This is a strong circumstance to prove a loan. If defendant's theory of the transaction be correct, then plaintiffs simply threw themselves upon his bounty and became his pensioners. They went on and improved the property to the extent of $200, which defendant does not attempt to disprove.

"The fact, that there is a great inadequacy between the sum received by the grantee and the real value of the land will not of itself authorize a court to permit a redemption. But it is a circumstance which is entitled to weight as tending to show that the transaction was not really a sale but in fact a mortgage." 2 Devlin on Deeds, 1133. "The grantor's continuance in possession is a circumstance tending to show that the transaction is a mortgage. If the vendor remains in the possession of the property after the alleged sale this is a circumstance that tends to show that it was not really a sale but a mortgage." 2 Devlin on Deeds, 1131.

Plaintiffs' theory of the transaction is sustained by the inadequacy of price, their continued possession and the making of improvements. Besides these, they are corroborated by Ratliff, Boggess, Mahan and Gillespie. Ratliff says he told Mrs. Cobb, in the presence of Mrs. Day, that she could sell the property for $100 an acre before sundown if she wanted to, and she replied she did not want to sell, but wanted it for a home. We feel disposed to hold that what Ratliff says imports absolute verity. He is evidently one of nature's noblemen. He had the power, the unquestioned legal right, to turn these poor people out in the streets and double his money on the transaction. The contract of sale had been "rubbed out," as he called it, and all he had to do was to assert his right. But he did not do it. He did not let his cupidity overcome his kindness. He

swears positively that Mrs. Cobb said in the presence of her sister, at the time the deed was executed, she did not want to sell, but she wanted the property for a home.

Boggess says he learned from the parties that the deed was to be made to secure a loan and suggested that that was an unsafe way to do business, and then he learned Mrs. Cobb and Mrs. Day were sisters, and willing to trust each other. Mahan says defendant told him he had let Cobb have $300, and taken a deed of trust for the money, and Gillespie testifies defendant said he had let the Cobbs have $300 to buy the land, and, if they got able to pay it back, they were to have the land. Plaintiffs' positive statements that this money was advanced as a loan, corroborated as they are by these witnesses and these cogent circumstances, convince us that it was a loan, and the deed was intended as a mortgage and not as an absolute deed. The character of this transaction must be determined by what was said and done at the time the deed was made, and not by the authority Mrs. Day had as evidenced by her husband's letter to her. If she advanced the money under such conditions as made it a loan, then defendant is bound by it, though she exceeded her authority. To hold otherwise would be inequitable to plaintiffs. The question is what contract did Mrs. Day in fact make; not what contract she was authorized to make. *Davis v. Brewster*, 59 Texas, 93.

If plaintiffs thought the transaction was simply a loan and that they had a right to redeem, this fact is entitled to some consideration in the determination of the question here involved, even though defendant did not so understand it. We do not mean to assert that this is a controlling circumstance, but yet it is a fact entitled to some weight, especially in a case where the parties stand precisely where they stood at the time the deed was made. While this court in the case of

*Holmes v. Fresh*, 9 Mo. 201, held that "it is not suffi-
cient to make a sale, purporting to be absolute a mort-
gage, that the party executing it considered it as such ;
it must be so considered and intended by all the parties
thereto." Yet, it was expressly announced in the same
case that the misunderstanding of the parties in rela-
tion to the nature of the contract "was a circumstance
which the chancellor ought to consider." Indeed, we
see no reason why a court of equity cannot interfere
and set aside a contract in a case where the parties do
not understand the transaction alike, and where they
can be put *in statu quo. Norton v. Bohart*, 105 Mo.
615. But we believe the weight of the evidence is that
Mrs. Day told plaintiffs they could redeem by paying
the amount advanced with ten-per-cent. interest.

We do not regard the fact that plaintiffs did not
pay the taxes after 1882, and not much, if any, interest
on the debt, as very potent circumstances against
plaintiffs' contention ; for the property, as it was being
improved, was a safe investment for the loan with
interest and taxes, and in a short time the property
advanced in price enormously, "jumped up" as Mr.
Ratliff expressed it, till in 1885, it was worth $1,000 or
more an acre.

There is another circumstance that has great weight
with us in this case. It is the inequality between the
parties as to this world's goods, and as to business
capacity. The defendant and his wife claim they aided
plaintiffs in various ways by letting them have money
and furnishing clothing, some old, some new. Plain-
tiffs had a houseful of children. In one of Mrs. Cobb's
letters to her sister asking for this loan, she writes, "I
need not tell you that we are all anxiously waiting to
hear from you or Mr. Day as the time is drawing closer.
*I have worried myself almost sick.*" This impassioned
language is the key to the whole situation. Mrs. Cobb
felt there was danger of her little home slipping away
from them, and she and her children be turned out in the

street.  These were the conditions and surroundings
that environed them when Mrs. Day went to their house
to advance the money.  Mrs. Cobb and she were sisters.
Three hundred and thirty dollars was not much more than
half what the property was worth, and we do not feel
that a court of equity ought to give effect to a deed
obtained at a time, under the circumstances, and for the
consideration this was.  The bargain is too hard and
unconscionable to find favor in a court of equity.  The
parties stand where they stood in 1881.  Their situation
has not been changed since the deed was made.  Plain-
tiffs offer to pay back with ten-per-cent. interest the
original amount advanced, and the taxes.  Defendant
has permitted his cupidity to overcome his better nature,
and caused him to forget the ties of relationship.  If he
be permitted to take this property, plaintiffs will indeed
be turned into the streets with their children, and
defendant would take the profit made by the rise in the
value of the property, "the unearned increment," as
Mr. Henry George would term it.

On the other hand by letting plaintiffs redeem,
defendant gets all that is legally and morally his own,
and plaintiffs will be left with a home.  This will put
the parties absolutely *in statu quo*, and this is eminently
equitable in this case.  " Where the transaction dis-
closes such unconscionableness as shocks the moral
sense and outrages the conscience, courts will interfere
to promote the ends of justice."  *Railroad v. Brown*,
43 Mo. 294.

It has been said that mere inadequacy of price,
abstracted from all other considerations is not sufficient
to induce a court to afford relief against a contract or to
set aside a deed.  If a person with his eyes open will
make a bad bargain, he must suffer by his own impru-
dence ; he has no right to complain, no title to apply to
a court of equity for relief.  But this circumstance when
connected with others which show that the person did not
understand the bargain he made or was so *oppressed he*

*was glad to make it,* knowing its inadequacy, will show a command over him which amounts to fraud. Newland on Contracts, 359.

In the case of *Osgood v. Franklin,* 2 Johns. Ch. 24, Chancellor ¦Kent says: "The doctrine is settled that in setting aside contracts on account of inadequate consideration the ground is fraud arising from gross inequality. Unless the inadequacy does of itself *ex evidentia rerum* prove fraud, the rule is, says Chief Baron McDonald, that inadequacy by itself has not the weight suggested. If, indeed, advantage be taken on either side, of the ignorance or distress of the other, it affords a new and distinct ground" of relief. *Holmes v. Fresh,* 9 Mo. 200.

"When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, *undue advantage, oppression on the part of the one who obtains the benefit,* or ignorance, weakness of mind, sickness, old age, *incapacity, pecuniary necessities* and the like on the part of the other, these circumstances combined with inadequacy of price may easily induce a court to grant relief, defensive or affirmative." 3 Pom. Eq. Jur., sec. 928.

Ordinarily we are disposed, and we ought in the very nature of things, to defer somewhat to the finding of the chancellor, who hears the case, but we feel that the evidence in this record discloses such equity in plaintiffs as demands our interference. It is, therefore, ordered that the judgment be reversed, and this cause is remanded with directions to the trial court to take an account of the amount due on the loan and for taxes paid by defendant and to permit plaintiffs to redeem upon payment of such amount. All of this division concur.